## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>D-4   JOSEPH HEZEKIAH FORD<br>         a.k.a. Co-CEO Joesky,<br><br>                    Defendant.<br>_____/ | No. 15-CR-20574-DPH<br><br>HON. DENISE P. HOOD<br><br>OFFENSE(S): 18 U.S.C. §§ 1962(d)<br><br>MAXIMUM PENALTIES:<br>Count One – Up to 20 years<br><br>MAXIMUM FINE: $250,000 |

### GOVERNMENT'S SENTENCE MEMORANDUM

The United States submits the following sentence memorandum as to Defendant JOSEPH FORD.

I.   Factual and Procedural History

In late 2011, the Band Crew street gang was created through a "merger" of several smaller gangs including CMH, YNC, PBF and FOE Life gangs at a Burger King located inside their territory.  The "Band Crew" or "22 Band Crew" established a territory on the northwest side of Detroit.  It consisted of the area around Seven Mile Road, between Southfield Freeway, West McNichols Road, Greenfield Road and Eight Mile Road.  While the Band Crew did not maintain an absolute hierarchical structure, the leaders of each subgroup who had influential

roles over the other gang members were identified as "CEOs" and "Co-CEOs." Band Crew members also continued to identify themselves as members of these smaller gangs. Band Crew members signified their involvement in the enterprise by obtaining gang related tattoos, wearing particular clothing, displaying gang signs, advocating for the release of incarcerated gang members, or "tagging" (spray painting) buildings with gang insignia related to Band Crew or the smaller groups.

The Band Crew established itself in an effort to control the territory it had claimed, to protect its members from rival gangs, and to generate income from selling controlled substances, primarily marijuana and through theft and robbery offenses.

The Band Crew often engaged in taking over area gas stations, to "hang out", steal from the gas station owners, threaten or rob customers and on at least three occasions known to law enforcement, engage in the discharge of weapons in exchanges with other people or during other criminal conduct. During searches of social media accounts of the Band Crew members, law enforcement recovered images that depicted numerous Band Crew members in possession of hand guns, long guns and semi-automatic rifles. The use of weapons by and against Band Crew members culminated in the shooting of a rival RTM gang member, a

2

retaliatory shooting of Band Crew member "Squid". The attempted murder of a young man, "Y.B." who was shot in the chest and the robbery and shooting of "C.H."

Defendant FORD was a member of Band Crew and identified himself as Co-CEO of CMH. During an interview with law enforcement, FORD confirmed that he joined Band Crew in 2012 and that the Band Crew is, in his opinion, the same as CMH and YNC. FORD, similar to other Band Crew members, has multiple gang-related tattoos. Ford believed that the Band Crew had approximately 200 members and held organized meetings at Burger King. Through searches of social media accounts, law enforcement officers seized evidence specifically involving FORD, which demonstrated FORD's involvement with and leadership role in Band Crew.

Among his other more general involvement in the gang, FORD was convicted of a gang related unarmed robbery in 2014 and was also involved in the sale of marijuana, usually at the gas stations utilized by Band Crew, and was arrested for possession with intent to distribute a controlled substance.

On September 16, 2015, Defendant FORD was charged in an eight-count Indictment filed under seal in the Eastern District of Michigan. Count 1 charged the defendant with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d).

On September 8, 2016, FORD appeared in Court, on writ and with counsel, before Chief United States Judge Denise Page Hood and tendered a plea of guilty to Count 1 of the Indictment pursuant to a Rule 11 Plea Agreement. He is scheduled to be sentenced on February 23, 2017.

II.     Sentencing Guideline Calculations and Relevant 3553(a) Factors

Congress has provided and pursuant to 18 U.S.C.§3553(a), relevant objectives and factors to be considered by sentencing courts in imposing a sentence sufficient, but not greater than necessary. Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of

4

similar conduct; and (7) the need for restitution.

A.     The Advisory Guideline Range

"This court and others have repeatedly held since Booker that district judges can find the facts necessary to calculate the appropriate Guidelines range using the same preponderance of the evidence standard that governed prior to Booker." United States v. Lacefield, 250 Fed.Appx. 670, 676 (6th Cir. 2007), citing United States v. Ferguson, 456 F.3d 660, 665 (6th Cir.2006) (citing, inter alia, United States v. Stone, 432 F.3d 651, 654-55 (6th Cir.2005

In United States v. Gall, 552 U.S. 38, 41 (2007), the United States Supreme Court provided a template for sentencing proceedings in the district court.  The Court held that a district court should begin sentencing proceedings by correctly calculating the applicable guidelines. Id. at page 47.  The Court also held that while the district court should begin all sentencing proceedings by correctly calculating applicable Guidelines range, after doing so, both parties should be provided for an opportunity to argue for whatever sentence they deem appropriate. Finally, the court should then consider all the statutory factors under §3553(a) to determine whether they support the sentence requested by either party prior to imposing sentence.

5

The Rule 11 Plea agreement between the government and Mr. Ford contemplated a sentencing guideline range of 33-41 months, resulting from the defendant's calculated Offense Level 18, Criminal History level III. The United States Probation Department has calculated a sentencing guideline range of Offense Level 18 and Criminal History Level IV as a result of a criminal history points that were not included by the parties.

B.     Title 18 U.S.S.G. §3553(a) - Imposition of a Sentence

        Nature and Circumstances of the Offense and the History
        and Characteristics of the Defendant 18 U.S.C. §3553(a)(1)

The nature and circumstances of the offense for which Mr. Ford has been convicted are detailed in Section I above and in the pre-sentence report prepared by the United States Probation Department. The offense in this case is a violation of federal law that focuses on the dangers associated with both criminal activity and the magnification of that conduct through the support and encouragement of like-minded criminal co-conspirators.

At age 19, Mr. Ford immersed himself in the community, activity and mentality of the Band Crew and CMH organizations. In March of 2014 he was in a car with other Band Crew members. When the Detroit Police stopped the car,

6

co-defendant Akeem Walker threw a loaded handgun from the vehicle.  Mr. Ford's unarmed robbery of a cell phone resulted in his being shot.  On May 18, 2015, Ford instructed co-defendant Bennett to inform co-defendants Perkins and Walker that Band Crew continues to exist and that a lot will change once Ford gets out of prison.

Clearly, the society and support for criminal activity that exists in a gang remained important to Ford, even after he had been incarcerated.  Mr. Ford has previous theft and robbery convictions.  He cannot legally possess a firearm.  His inability to do so is no mystery to him.  Nevertheless, he was not deterred.  This conviction and Ford's conduct does evidence a lack of respect for the law that Defendant Ford has demonstrated for some time.  It is that attitude and conduct that the government urges the court to bear in mind when considering the nature and characteristics of the defendant to decide the appropriate sentence.
The pre-sentence report reveals that the defendant was raised by his mother with help from several maternal aunts, who lived nearby. Ford described himself as having had a good childhood with no major problems. He denied any physical, mental or emotional abuse. His basic material needs were met. Growing up, he enjoyed playing basketball and hanging with his friends.

Given the success of the family life that he had when he was young, the life he is pursuing now and the potential he may possess – his criminal history and continued choice to violate the law is a serious concern.

With respect to his criminal history, Mr. Smith has three prior convictions, His convictions were committed in just over 18 months. (PSR ¶¶ 45-47).

In addition to the number, type and relative continuing nature of his criminal conduct as detailed in the presentence report, there are some additional aspects of his criminal history that the government asserts are relevant to the appropriate sentence.

In 2013, Ford was convicted of unarmed robbery in Oakland County. He was charged with retail fraud in Southfield. He was sentenced under the Holmes Youthful Trainee Act and was positioned to recover from his misdemeanor offense without a felony criminal conviction on his record. Less than 6 months later, Ford violated the terms of his probation and his YTA status by failing to comply and by committing an unarmed robbery, also in Southfield. He was again given the opportunity to maintain a relatively clean criminal history with a sentence under the Holmes Youthful Trainee Act. He violated those conditions but in April of 2014 was returned to probationary status. The Hon. Rae Chabot, Oakland County

8

Circuit Court, finally terminated Ford's probationary status and sentenced him to a 1 to 15 year prison sentence. Mr. Ford was next convicted of a May 2014 unarmed robbery in Wayne County for the theft of a cellular telephone and sentenced to 1 – 15 years in October of 2014.

Ford has continuously demonstrated that being under supervision by a court or probation department provides little deterrence to future criminal conduct.

C.  Seriousness of the Offense, Promoting Respect for Law, and Providing Just Punishment 18 USC §3553(a)(2)(A)

Following Ford's incarceration, he continued to encourage other Band Crew members from prison. Such statements could have been used as evidence had h proceeded to trial. Statements made to induce enlistment or further participation in the group's activities, made to 'reassure' members of a conspiracy's continued existence or made to keep coconspirators abreast of an ongoing conspiracy's activities s are considered to be "in furtherance" of the conspiracy. United States v. Dorn, 561 F.2d 1252, 1256–57 (7th Cir.1977), United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988); United States v. Taylor, 59 F. App'x 960, 967 (9th Cir. 2003). More importantly, the conversation evidences the seriousness of racketeering offenses and Ford's lack of respect for the law. The existence of a

9

criminal family or group raises the danger of all of the participants. Instead of surrounding one's self with people who might dissuade such conduct, Ford associated, and in some sense offered leadership, with those who supported and encouraged Band Crew activities.

The seriousness of this offense is societal. There are overt acts of violence on Mr. Ford's part. The gang's activity resulted in greater violence. Ford himself was shot in a retaliatory act of violence. Ford's continued criminal conduct is serious as well. Mr. Ford's continued violations speak clearly to his decision to ignore the law for the sake of whatever pleases him. A sentence that provides just punishment for Mr. Ford will hopefully convince him that his choice to engage in crime, and surrounding himself with others with a similar philosophy, will not be tolerated as well as encourage others to a respect for the law over their own individual desires.

D.   Deterrence: 18 USC §3553(a)(2)(B)

The second consideration of 3553(a)(2)(B) is the need to deter such conduct by others. The conduct engaged in by defendant Ford involved others, and a combined effort to engage in acts of violence, possess weapons, and distribute controlled substances. More importantly, previous fines, rehabilitative efforts,

10

probation, and jail terms have not deterred Mr. Ford from criminal conduct. The sentence imposed by this court will hopefully serve as a deterrent to this defendant in the future, and to others who contemplate engaging in such conduct.

Sentencing in the federal system has long contemplated the ability to provide both specific and general deterrence. United States v. Phinazee, 515 F.3d 511 (6th Cir. 2008); citing United States v. Turner, 173 Fed. Appx. 402, (6th Cir. 2006). See also United States v. Blackwell, 459 F.3d 739, 774 (6th Cir. 2006), (affirming a defendant's sentence where the district court in its §3553 analysis stated that it doubted the defendant would ever engage in the conduct again, but that a primary sentencing factor was the need "to deter other similarly situated individuals from engaging in the conduct".

E.   Protecting the Public; 18 U.S.C. §3553(a)(2)( C)

As to protecting the public from further crimes of this defendant, the United States is hopeful that Mr. Ford will elect to never engage in criminal conduct again. For any period of time that he is incarcerated, that is guaranteed. More importantly, his activities will be subject to monitoring while on supervised release, although his prior performance while on probation or parole suggests that he will have to make his own decision as to whether or not he will succeed this

time. He will hopefully take advantage of any program assistance that is provided by the probation department.

If Mr. Ford's sentence occasions such positive results, society will be further protected and his family will benefit from a future that is crime free. If not, and he returns to the illegal activity, Mr. Ford will most certainly sacrifice his family and liberty. That choice, as it always has been, is his. In the meantime, a prison sentence to be followed by a period of supervised release will provide appropriate protection to the public.

III.    Conclusion / Government Recommendation

The United States certainly recognizes the ability and responsibility of the Court to fashion a sentence within, or perhaps, outside of a particular sentencing guideline range. The United States respectfully requests that the Court consider all of the above in determining both the sentence for Defendant Joseph Ford, within the guideline range at 41 months and a period of supervised release of at least 3 years.

                                    Respectfully submitted,

                                    BARBARA L. MCQUADE
                                    United States Attorney

                                    s/ *John N. O'Brien II*
                                    John N. O'Brien II
                                    Assistant United States Attorney
                                    211 W. Fort Street, Suite 2001
                                    Detroit, Michigan 48226
February 21, 2017                   313-226-9715

CERTIFICATE OF SERVICE

I hereby certify that on Tuesday, February 21, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jerome Sabbota
contact@ribitwersabbota.com

        s/ *John N. O'Brien II*
        John N. O'Brien II
        Assistant United States Attorney
        211 W. Fort Street, Suite 2001
        Detroit, Michigan 48226
        313-226-9715